ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of -- ) | |
| ) | |
| Aegis Defense Services, LLC d/b/a ) | ASBCA Nos. 62442, 62686, 62718 |
| GardaWorld Federal Services ) | 62793, 62794 |
| ) | |
| Under Contract No. W52P1J-11-D-0082 ) | |

APPEARANCES FOR THE APPELLANT: Paul E. Pompeo, Esq.
Thomas A. Pettit, Esq.
Arnold & Porter Kaye Scholer LLP
Washington, DC

APPEARANCES FOR THE GOVERNMENT: Scott N. Flesch, Esq.
Army Chief Trial Attorney
CPT Michael Brown, JA
MAJ Seth Ritzman, JA
Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE D'ALESSANDRIS ON THE
GOVERNMENT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Pending before the Board is the amended motion for partial summary judgment filed by respondent, the United States Army (Army or government). The Army awarded appellant, Aegis Defense Services, LLC, d/b/a GardaWorld Federal Services (GWFS), a contract and multiple firm-fixed-price task orders for security support services in Iraq and Afghanistan. The Army contends that GWFS failed to meet the contractual minimum staffing requirements, based upon its interpretation of the task orders as requiring GWFS to provide a minimum number of guards, and limiting the guards to one 8 hour shift per day. The Army directed GWFS not to invoice for any labor hours beyond what the Army contends was permitted by the task orders. GWFS disputes the Army's contractual interpretation and asserts that all posts were fully manned in accordance with the task orders, and seeks payment of the firm-fixed-price contract amounts. We grant the government's motion with regard to Count 3 of GWFS' second amended complaint but hold that there are material factual disputes regarding Counts 1, 2, 5, 8, and 10, and deny the government's motion with regard to those counts.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

I.      *The Contract*

On June 1, 2011, the government awarded GWFS one of three Multiple-Award Indefinite-Delivery, Indefinite-Quantity (IDIQ) contracts for security support services in Iraq (R4, tab 1 at 1, 4). The contract, Contract No. W52P1J-11-D-0082, provided that "[s]ervices shall be performed in accordance with the Performance Work Statement (PWS)" and "[a]ctual services rendered will be identified at the task order level" under the contract "on a firm fixed unit price by team or service requirement . . . ." The contract specified "[t]he contractor shall perform in accordance with the specified Government issued Task Orders." The contract incorporated GWFS's April 8, 2011 offer. (*Id.* at 4)

The contract included Federal Acquisition Regulation (FAR) 52.246-4, INSPECTION OF SERVICES – FIXED PRICE, by reference (R4, tab 2 at 228, 358 at 17407). FAR 52.246-4 allows the government to "reduce the contract price to reflect the reduced value of the services performed" when "defects in services cannot be corrected by reperformance . . . ." FAR 52.246-4(e).

The PWS required GWFS to "develop and maintain an effective quality control program and plan to ensure services are performed in accordance with [the] PWS." The PWS also directed the contracting officer to follow FAR 52.212-4, CONTRACT TERMS AND CONDITIONS – COMMERCIAL ITEMS, or 52.246-4, INSPECTION OF SERVICES – FIXED PRICE, "for contractor's failure to perform satisfactory services or failure to correct non-conforming services." (R4, tab 1 at 86, tab 2 at 191-92, tab 3 at 335)

The contract's Quality Assurance Surveillance Plan also provides "Remedies for Unacceptable Performance," when "services do not conform with contract requirements," including reducing "the contract price to reflect the reduced value of the services performed" (R4, tab 1 at 111, tab 2 at 278-89).

On July 19, 2016, the government issued Modification No. P00016 to the contract to include security support services for the Afghanistan Area of Responsibility (R4, tab 4 at 347, 349). The accompanying PWS required GWFS to "develop and maintain an effective quality control program consistent with this standard and plan to ensure services are performed in accordance with [the] PWS" (R4, tab 4 at 383). Modification No. P00016 also incorporated 52.246-4, INSPECTION OF SERVICES – FIXED PRICE (AUG 1996) by reference (R4, tab 4 at 427).

On April 25, 2018, the government issued Modification No. P00021 to the contract, which "extend[ed] and exercise[ed] the ordering period against the basic

2

contract for a period of performance" from June 1, 2018 to May 31, 2019 (R4, tab 12 at 841, 843).

## II.   TASK ORDER No. 0K02

On September 16, 2016, the government issued Task Order (TO) No. 0K02 to GWFS for "armed security guards for entry control points, roving patrols, and tower services in support of [Operating Base] (OB) Fenty in Afghanistan" (R4, tab 5 at 473, 476).  On June 14, 2017, the parties entered into bilateral Modification No. 02 to task order no. 0K02 to incorporate Camp Pittman into the scope of work (R4, tab 9 at 699, 701).  On May 25, 2018, the parties entered into bilateral Modification No. 05 to task order no. 0K02, which extended the period of performance from May 29, 2018 through May 28, 2019 for the Fenty Base and from June 1, 2018 through May 30, 2019 for the Camp Pittman Base.  Modification No. 05 to task order no. 0K02 also included an updated PWS.  (R4, tab 13 at 844, 846)

Task order no. 0K02 required that "[t]he contractor shall provide the required minimum staffing 100% of the time at designated posts in accordance with the manning table" provided (*id.* at 894).  Task order no. 0K02 further specified a performance threshold of "[f]ull (100%) compliance in all cases" regarding required manning (*id.* at 910).

The task order required GWFS to provide various categories of guards, with separate contract line items (CLINs) for each guard category and location. CLIN 1301AB required GWFS to provide 147 Guards Other Country National (OCN) at OB Fenty, while CLIN 1301BA required provision of 6 Guards OCN at Camp Pittman (*id.* at 848, 851).  Each of the CLINs uses similar contractual language.  As an example, CLIN 1301AB provides for "147 Guard OCNS at a daily rate of $70.87/Guard OCN for Fenty" (*id.* at 848).  For the category Guard Resolute Support Mission-Afghanistan (RSMA), CLIN 1301AC required 69 guards at OB Fenty, while CLIN 1301CA required 18 guards at Camp Pittman (*id*. at 848, 853).  For Guard U.S. Expat, the requirements were split across multiple CLINS with CLIN 1301AE requiring 15 guards; CLIN 1301AH requiring 6 guards; and CLIN 1301AJ requiring 1 assistant site supervisor; CLIN 1301AK requiring 1 guard, all at OB Fenty and CLIN 1301BH requiring 3 guards; and CLIN 1301BK requiring 1 guard at Camp Pittman (*id.* at 849-50, 852-53).  CLIN 1312AH required 7 Guards Five Eyes (Australia, Canada, New Zealand, the United Kingdom and the United States) (FVEY) positions (*id.* at 868).

The task order position descriptions for Guard OCN (¶ 5.38.4), Guard RSMA (¶ 5.38.5), Guard U.S. Expat (Level II) (¶ 5.38.7, CLIN 1301AE); Guard Shift Leader U.S. Expat (Level I) (¶ 5.38.9, CLIN 1301AH and CLIN 1301BH); and Guard Shift Leader FVEY (Level 1) (¶ 5.38.17) each contained language providing that the guards should be capable of performing postings of up to 12 hours when directed by the PCO,

ACO or government authority, but that the "Guards shall be limited to 8 hour shifts not more than 6 days per week unless otherwise directed by the PCO, ACO, or government authority" (*id.* at 901-05). For the Guard OCN and Guard RSMA positions, the task order additionally provides that the "Guards shall be limited to 8 hour shifts not more than 6 days per week to perform guard services (48 hours). Up to 24 additional hours per week are authorized to include time to mount, post and relief as well as training recertification unless otherwise directed by the PCO, ACO, or government authority." (*Id.* at 901) The position description for Guard Site Supervisor U.S. EXPAT (Level I) (¶ 5.38.12) does not contain the 8-hour shift limitation (*id.* at 902).[1]

In addition to the CLIN staffing requirements, and the position descriptions, the task order also contained a "manning table" itemizing the number of guards of each category required to staff each entry control point and perimeter defensive position, and the number of shifts per day per position (*id.* at 895-97). Multiplying the number of positions by the number of shifts results in the total number of guards for each control point and defensive position, and then these numbers are summed to provide a total number of guards by category, and a cumulative total of all positions (*id.*).[2]

Task order no. 0K02 required that the contractor "provide a daily situation report which shall include at a minimum: . . . b. Contractor shall provide a daily head count of all staff performing under the TO and list names of all personnel" (*id.* at 912). However, the task order provided that the government would inspect GWFS' performance by "on-site visual inspection" (*id.* at 910).

The government contends that the contractually-required daily situation reports GWFS submitted under task order no. 0K02 compared to the task order's minimum manning requirements demonstrates that GWFS failed to provide the required minimum staffing for the Fenty Base and Camp Pittman Base 100% of the time in accordance with the manning table and thus, GWFS failed to conform to contract requirements (gov't mot. at 4, citing R4, tabs 17, 22, 27, 31, 48, 50, 59, 65, 70, 81, 90, 103, 106, 114-15, 140, 152, 162-64, 186-87, 204-05, 227-28, 248, 267, 290, 313, and 300).[3] GWFS disputes the government's factual finding (app. resp. at A3). As

---

[1] CLIN 1301AJ Assistant Site Supervisor U.S. EXPAT Secret (R4, tab 13 at 850) does not appear to map to any of the position descriptions.

[2] The manning table includes a requirement for 9 Guard LN positions (R4, tab 13 at 897) that do not appear to map to any of the CLINs. In fact, the position description for Guard LN (¶ 5.38.3) states that the position is "not required" (*id.* at 901).

[3] The government's motion provides no detail regarding GWFS' alleged "failure to conform to contract requirements" beyond the string cite of R4 documents quoted. The government may have relied upon a native format version of these spreadsheets in preparing its motion; however, the Rule 4 file versions of these documents are incomprehensible. For example, the first cited Rule 4 file

4

discussed below, we find that there is a material factual dispute regarding whether GWFS complied with the terms of the task order.

The government notified GWFS of its alleged failure to comply with contractual requirements in Level II - Major Nonconformance Reports (NCR) dated August 30, 2018 (R4, tab 364 at 17452), and September 25, 2018, stating that GWFS "failed to provide the required minimum manning. . . ." (R4, tab 376 at 17477) and also in a Contractor Performance Assessment Report (CPAR) for the time-period of September 15, 2018 through September 14, 2019 in which the government rated GWFS as "Marginal" for management under task order no. 0K02 (R4, tab 386 at 17498-99). The government contends that GWFS responded to each of these reports by acknowledging its deficiencies and stating that it would bring its performance into compliance with the contract (gov't mot. at 4-6). GWFS has submitted declarations controverting the government's proposed facts and stating, in essence, that GWFS was attempting to placate the customer and never agreed with the government's interpretation of the contractual language (app. resp. at A3-6).

### III.   TASK ORDER No. 0K03

On September 29, 2016, the government issued task order no. 0K03 to GWFS for armed security guards for interior/internal roving patrols at Kandahar Airfield in Afghanistan (R4, tab 6 at 531, 534). On June 5, 2018, the parties entered into bilateral Modification No. 04 to task order no. 0K03, which included an updated PWS (R4, tab 15 at 952, 954). Task order no. 0K03 contained, in relevant part, the same contractual language and provisions as task order no. 0K02. The government issued a Level II Major NCR on June 30, 2018 followed by a Level III – Critical NCR on September 7, 2018 regarding GWFS' staffing (R4, tab 368 at 17462-63). GWFS again controverted the government's proposed findings of fact on this issue (app. resp. at A7-8).

### IV.   TASK ORDER No. 0K04

On February 17, 2017, the government issued task order no. 0K04 to GWFS for armed security guards for entry control points and tower services at Forward Operating Base (FOB) Oqab in Afghanistan (R4, tab 7 at 587, 590). On July 2, 2018, the parties entered into bilateral Modification No. 04 to task order no. 0K04, which included an

document (tab 17) is a spreadsheet, or maybe two spreadsheets split over 64 pages. Multiple pages in the file lack column or row titles. Even without the material factual disputes addressed below, we would be unable to grant the government's motion because we see no support in the record for the government's assertion that GWFS did not satisfy the minimum manning requirements.

updated PWS (R4, tab 20 at 1769, 1771). Unlike task orders nos. 0K02 and 0K03, task order no. 0K04 did not include the requirement that guards be limited to 8 hours shifts. In addition, the task order does not contain a manning table. However, in place of the manning table, the task order provides:

> The totals in the manning table below[4] have included a reserve capacity flexibility to account for personnel changes, staff rotations, emergency leave, R&R, scheduled off days and surge capacity.
>
> The PWS requires 57 personnel (1 Site Supervisors [sic], 2 Shift Leaders, and 54 Armed Security Guards (ASG). The contractor is responsible of [sic] securing four (4) towers, eight (8) sectors, and two (2) actively surveying within the perimeter of the installation at all times. There are two (2) 12-hour shifts per day, seven (7) days per week. Each shift will have one (1) site supervisor. This equals 47 shifts per day.

(*Id.* at 1816) Task order no. 0K04 otherwise contained the same relevant contractual language as task orders nos. 0K02-0K03.

As was the case with task orders 0K02-0K03, the government issued GWFS a Level II – Major NCR on July 29, 2018 (R4, tab 359 at 17441) and a Level III - Critical NCR on September 22, 2018 (R4, tab 375 at 17475). As with the other task order no. 0K03, the government contends that GWFS' response to the NCR (R4, tab 360 at 17443-45) demonstrates that GWFS agreed with the government's contractual interpretation (gov't mot. at 8-9). However, GWFS has submitted declarations controverting the government's proposed findings of fact (app. resp. at A9-13). GWFS additionally notes that the NCR states that GWFS was meeting the contractual requirements (app. resp. at A10 (citing R4, tab 359 at 17441 (GWFS "is only narrowly meeting contractual requirements on a regular basis; however, on 24 July 2018, it dropped below an acceptable level, creating a gap in service"))).

### V.    TASK ORDER No. 0K06

On March 29, 2017, the government issued task order no. 0K06 to GWFS for armed security guards to man guard towers on the perimeter of Kandahar Airfield, operate and provide security for base entry control points, provide flight line security, and maintain constant security of the ammo supply point (R4, tab 8 at 643, 645). On June 12, 2018, the parties entered into bilateral Modification No. 03 to task order

---

[4] As noted above, the task order does not contain a manning table.

no. 0K06, which included an updated PWS (R4, tab 16 at 1001, 1003).  Task order no. 0K06 contained, in relevant part, the same contractual language and provisions as task orders nos. 0K02-0K03.

### VI.    TASK ORDER No. 0K08

On March 8, 2018, the government issued task order no. 0K08 to GWFS for armed security guards and internal roving patrols in support of NATO Special Operations Command – Afghanistan locations in Afghanistan, including Camp Pamir, Camp Antonik, Camp Brown, Camp Gibson, Camp McKenna, and Camp Vance (R4, tab 11 at 784, 787).  Task order no. 0K08 contained the 8 hour per day restriction for the Guard OCN positions, but not for the other guard positions (*id.* at 815-18).  In addition, the manning table contained in the task order provided that for non-management positions "("Armed Guards Level II") and ("Armed Guards OCN") the contractor is allowed no more than one employee absent per location.  The exact numbers required for minimum manning are shown in the Minimum manning row in the table below to resolve any potential ambiguity."  (*Id.* at 830)

As with task orders nos. 0K02-0K03, the government issued GWFS a Level II - Major NCR under task order no. 0K08 on August 22, 2018 noting the contractual manning requirements and specifying GWFS's drop "below an acceptable level, creating a gap in service" (R4, tab 362 at 17448-49).  GWFS submitted declarations disputing the government's interpretation of its response (app. resp. at A16-17).  GWFS additionally notes that the government NCR found that GWFS was meeting the contractual requirements (app. resp. at A16 (citing R4, tab 362 at 17449 ("manning at Camp Vance is very limited and [GWFS] is only narrowly meeting contractual requirements on a regular basis; however, on 15 August 2018, it dropped below an acceptable level, creating a gap in service"))).

### VII.    GWFS' Claim and Related Actions

On October 23, 2019, GWFS submitted a certified claim in the amount of $6,590,398.61 for what it characterized as "outstanding amounts due."  GWFS asserted that it satisfied the contract's performance-based requirements and alleged that the government had changed the contract requirements and converted the contract from a firm-fixed-price contract to a time-and-materials contract.  (R4, tab 340 at 16741-42)  The contracting officer did not issue a final decision on the claim within 60 days, thus on March 16, 2020 GWFS timely appealed to the Board on a deemed denial basis; which was docketed as ASBCA No. 62442.  On September 17, 2020, Ms. Kaitlin H. Rasdon, of the Army Contracting Command – Rock Island, issued a Contracting Officer's Final Decision (COFD), denying GWFS' claimed amounts under task orders nos. 0K02, 0K03, 0K04, and 0K06 in their entirety.  Ms. Rasdon approved GWFS' claim in the amount of $447,135.34 under task order no. 0K08 and denied GWFS' claim for all additional

7

amounts under task order no. 0K08. In addition, Ms. Rasdon determined the government overpaid GWFS by $1,060,184.88 under task order no. 0K02; $893,283.88 under task order no. 0K03; $1,024,915.82 under task order no. 0K04; and $1,176,361.64 under task order no. 0K06. (R4, tab 356 at 1, 16-17) Ms. Rasdon's stated basis for the denial of GWFS' remaining claimed amounts was "GWFS['s] fail[ure] to comply with the terms of the task order, by not staffing as required by the task order, GWFS did not provide full contract performance in accordance with the terms of the contract" (*id.* at 16). On September 30, 2020, GWFS timely appealed this decision, which the Board docketed as ASBCA No. 62686.

On October 31, 2020, Ms. Danielle M. Gainey, of the Army Contracting Command – Rock Island, issued a revised COFD to correct calculation errors in the September 17, 2020 Contracting Officer's Final Decision. Ms. Gainey denied GWFS's claimed amounts under task orders nos. 0K02, 0K03, and 0K04 in their entirety. Ms. Gainey approved GWFS' claim in the amounts of $157,651.28 under task order no. 0K06 and $1,021,339.94 under task order no. 0K08 and denied GWFS' claim for all additional amounts. (R4, tab 389 at 17507, 17525-30) In addition, Ms. Gainey determined the government overpaid GWFS by $813,488.33 under task order no. 0K02; $540,301.87 under task order no. 0K03; and $508,036.82 under task order no. 0K04 (*id.* at 17521-24). Ms. Gainey's stated basis for the denial of GWFS' remaining claimed amounts was GWFS' failure to comply with the terms of the task orders by not meeting the minimum manning requirements (*id.* at 17529). By letter dated November 3, 2020, GWFS timely appealed "to avoid any potential jurisdictional issues the Government may have created." The Board docketed this filing as ASBCA No. 62718.

On January 7, 2021, Ms. Gainey issued another COFD again revising the calculations regarding the amounts the government owes GWFS under task order no. 0K08 and the amounts the government asserts it overpaid GWFS under task orders nos. 0K02, 0K03, and 0K04 (R4, tab 391). Ms. Gainey determined the government's corrected amount due GWFS is $157,651.28 under task order no. 0K06 and $1,024,297.20 under task order no. 0K08 for a total of $1,181,948.48. The January 7, 2021 final decision also included an affirmative claim for $255,285.93 under task order no. 0K02; $102,714.58 under task order no. 0K03; and $508,036.82 under task order no. 0K04, for a total of $866,037.33. The difference between the contracting officer's determined amount owed by the government to GWFS $1,181,948.48, and the amount overpaid to GWFS and owed back to the government, $866,037.33, is a total of $315,911.15 owed by the government to GWFS. (*Id.* at 17797-808) On January 19, 2021 GWFS appealed the revision of the earlier COFDs relating to the original claim (docketed as ASBCA No. 62793) and the government's affirmative claim (docketed as ASBCA No. 62794). All appeals have been consolidated for ease of administration.

DECISION

*I. Standard of Review*

We will grant summary judgment only if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one that may affect the outcome of the decision. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The moving party bears the burden of establishing the absence of any genuine issue of material fact, and all significant doubt over factual issues must be resolved in favor of the party opposing summary judgment. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987). Once the moving party has met its burden of establishing the absence of disputed material facts, then the non-moving party must set forth specific facts, not conclusory statements or bare assertions, to defeat the motion. *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 626-27 (Fed. Cir. 1984). "A genuine issue of material fact arises when the nonmovant presents sufficient evidence upon which a reasonable fact finder, drawing the requisite inferences and applying the applicable evidentiary standard, could decide the issue in favor of the nonmovant." *C. Sanchez and Son, Inc. v. United States*, 6 F.3d 1539, 1541 (Fed. Cir. 1993).

*III.    With the Exception of Count 3, Factual Disputes Prevent Entry of Summary Judgment*

The government asserts that the contract and task orders "clearly and unambiguously on their face required the appellant to provide a certain amount or level of manning for security" (gov't sur-sur-reply at 1). The government additionally notes that the contract permitted the government to reduce the contract price to reflect GWFS' failure to supply the required manning (*id.* at 1-2). However, the government does not allege that GWFS failed to staff the posts, but rather that GWFS did not employ enough guards to staff the positions in compliance with the length of shift restrictions applicable to certain labor categories, and contained in some, but not all, of the task orders. In the final decisions, the government appears to count the number of guards working that day, and compares that to the number of 8-hour shifts, and then treats the difference as not having been performed and of no value. We start with interpretation of the contract and then address the government's reduction of the firm-fixed-price contract amounts.

*A. The Contract Task Orders Contain Minimum Staffing Requirements*

The government contends that the manning tables, standing alone, create a contractual requirement that GWFS must employ a minimum number of guards (gov't mot. at 16-17). In its reply brief the government cites additionally to the task

9

order position descriptions providing that guards are limited to 8 hours shifts per day, 6 days per week (gov't reply at 6). GWFS contends that the subject contract is a firm-fixed-price contract, and thus, it was within its discretion to determine how to staff the contract and that it complied with the contractual requirements and fully staffed the required minimum force by having guards work more than 8 hours per shift (app. resp. at 13) ("nothing in the Contract or the Task Orders prevented GWFS from assigning guards to multiple shifts in the same day") (emphasis deleted). GWFS additionally contends that "[t]he only restriction on GWFS' ability to staff the Task Orders is that GWFS cannot require any Guard RMSAs to work more than 72 hours per week" (*id.*). GWFS notes that the government has not alleged that it violated the 72-hour work-week limitation (*id.* n.2). GWFS further disputes the government's contractual interpretation, contending that there is a latent ambiguity that should be interpreted against the government pursuant to the doctrine of *contra proferentem* (*id.* at 24-26).

As always, we begin with the plain language of the contract, giving terms their normal meaning and interpreting the contract as a whole, giving meaning to each clause. *See*, *e.g.*, *Manhattan Hunt*, *A Joint Venture*, ASBCA No. 61477, 19-1 BCA ¶ 37,386 at 181,756. Here the manning tables, standing alone, could be ambiguous, as to whether the numbers of guards represented a number of shifts to be performed, or a minimum number of guards to be employed, given that it is a firm-fixed-price contract, and not a time and materials contract. However, read in conjunction with the CLINs providing that GWFS was to provide a set number of guards (*e.g.* "147 Guard OCNS") and that the guards were limited in the position descriptions to "8 hour shifts not more than 6 days per week" (*see*, *e.g.*, R4, tab 13 at 848, 901) it is clear and unambiguous that GWFS was required to use a minimum number of guards to staff the task order.

The contractual language of task order no. 0K04, despite not containing the 8-hour daily limitation, is more explicit in requiring a minimum number of guards. The performance work statement specifically, and unambiguously, "requires 57 personnel (1 Site Supervisors [sic], 2 Shift Leaders, and 54 Armed Security Guards (ASG)" (R4, tab 20 at 1816).

Having determined that the plain language of the contract requires the contractor to provide a minimum level of staffing, we need not address the government's extrinsic evidence. The government's motion cites extensive extrinsic evidence attempting to demonstrate that the contract and task orders were not ambiguous (gov't mot. at 13 n.1). This evidence largely consists of government nonconformance reports and GWFS' responses to the government's nonconformance reports. GWFS submitted six declarations by individuals with personal knowledge of GSFS' responses to the nonconformance reports controverting the government's proposed interpretation of the documents (app. resp. attach. A-F).

GWFS contends that the government contracted for security services rather than a set number of guards (app. resp. at 7-14); and that the task order contains a latent ambiguity and must be interpreted against the government (*id.* at 24-26). As explained in more detail below, we agree with GWFS that the contract and task orders are firm-fixed-price agreements for security services and not time and materials or level of effort contracts for a set number of guards. However, we agree with the government that the contract contained minimum staffing requirements. As explained above, we hold that the plain language of the contract required a minimum number of guards for each task order. GWFS cites to various contract provisions that specify the security services to be provided and alleges that the "manning charts do not identify the total number of personnel that GWFS was required to employ. Rather they provide the minimum service levels -- that is, the number of shifts required at each location per day." (*Id*. at 12) We disagree. The CLINs required GWFS to provide a set number of guards. GWFS alleges that "nothing in the Contract or the Task Orders prevented GWFS from assigning guards to multiple shifts in the same day." (*Id* at 13 (emphasis deleted)) This ignores the position descriptions providing that, in most but not all situations, the guards were limited to 8 hours per day, 6 days per week (*see, e.g.*, R4, tab 13 at 901-05).

GWFS' latent ambiguity argument is also unavailing. GWFS asserts that the contract is susceptible to more than one interpretation because the contract can be reasonably interpreted to require GWFS to provide security services, and this is a latent ambiguity where the government interprets the contract as requiring a specific staffing of the contract. As explained in more detail below, we read the contract as requiring GWFS to provide a specified level of security services and that the specified level of security requires a minimum level of staffing.

Count 3 of GWFS' second amended complaint asserts that the contract and task orders contain a latent ambiguity that must be interpreted against the government pursuant to the doctrine of *contra proferentum*. We interpret the plain language of the contract and task orders as requiring GWFS to provide the specified minimum staffing. Accordingly, we grant the government's motion with regard to Count 3 of GWFS' second amended complaint. Additionally, we reject GWFS' argument that the entry of summary judgment would be premature because the parties have not completed discovery (app. resp. at 27-28). Count 3 involves only contract interpretation and is a question of law. GWFS has not alleged that facts regarding the language of the contract were unavailable and has not stated or complied with the provisions of Fed. R. Civ. P. 56(d) to establish that it is unable to respond to the government's motion without discovery. *Odyssey Int'l, Inc.*, ASBCA Nos. 62062, 62279, 21-1 BCA ¶ 37,902 at 184,073-74.

11

*B. The Government Has Not Established That GWFS Failed to Provide the Contractually Required Level of Security*

Despite agreeing, generally, with the government's proffered interpretation of the contract, we deny the government's motion for partial summary judgment with regard to Counts 1, 2, 5, 8, and 10 of GWFS' second amended complaint. The government seeks summary judgment with regard to Count 2, alleging a constructive change to the contract and task orders by converting the contract from a firm-fixed-price contract to a level of effort or time and materials contract. FAR 52.246-4(e) provides that when defects in services cannot be corrected by reperformance the government may "reduce the contract price to reflect the reduced value of the services performed." FAR 52.246-4(e). The crux of the dispute is how the government's final decision calculated the reduction in the contract price to account for GWFS' understaffing.

The dispute can be illustrated through a simple hypothetical example. If a task order required 5 positions to be staffed 24 hours per day, with 8-hour shifts, the government interprets the contract as requiring 15 guards (5 guards x 3 shifts) on that day, working 120 labor-hours (5 guards x 8 hours per shift x 3 shifts per day = 120 hours). If GWFS employed 10 guards but required each guard to work 12 hours, GWFS would have supplied the required 120 labor hours, with each guard post staffed 24 hours per day. GWFS contends that with a fixed-price contract, it was within its control to determine how to staff the contract. The government, relying on the manning tables, contends that the contract required 15 guards and would only pay GWFS for 80 labor-hours (10 guards at 8 hours per shift) and would treat the remaining 40 hours as not having been performed.

GWFS contends that Board precedent precludes a reduction in the firm-fixed-price contract amount, so long as the contractor otherwise performed the services required (app. resp. at 20-22) (citing *Wilkins Systems, Inc.*, ASBCA No. 44338, 94-3 BCA ¶ 27,062). In *Wilkins*, the contractor was to staff a Technical Information Center with a qualified librarian and a library technician, and did so except during the last month of the contract term, when the library technician position was vacant. *Wilkins*, 94-3 BCA ¶ 27,062 at 134,850. During this period, the librarian worked overtime to ensure that the contractor met the performance specifications of the contract. Critically, the Board held that the government did not establish that the contractor failed to perform any contractual duty and that the government had "acquiesced" in the contractor's plan to have the librarian work overtime to staff the site. *Id.* at 134,850-51. Here, the government did not acquiesce in GWFS' staffing plan, and, in fact, repeatedly filed notices of non-compliance regarding the staffing issues and noted the issues in CPAR assessments (R4, tabs 359, 362, 364, 368, 375-76, 386).

For the government to be entitled to entry of summary judgment, it would need to show not only that GWFS breached the terms of the contract by not providing the

12

required staffing, but also that the substituted performance was less valuable than the work required by the contract. *See*, *e.g.*, *Crown Federal Services*, *Inc.*, ASBCA No. 43207, 92-2 BCA ¶ 24,958 at 124,373. The *amount* of the diminution in value is a question of quantum, but the government must demonstrate some decrease in value. Here, the government simply includes argument by counsel that "[i]t is a reasonable premise that a security guard approaching the end of a 12-hour shift may not be as effective or alert as a security guard having only worked eight hours or less." (Gov't reply at 2) We agree that that is a "reasonable premise;" however, the standard of review requires that we grant all inferences to GWFS, the non-moving party. GWFS notes that task order no. 0K04 explicitly provides for a 12-hour shift, and many of the contract line items in the other task orders require the guards to be capable of working 12 hour shifts at the request of the government (app. sur-reply at 5-7). Thus, there is a factual question as to whether a guard's performance of a shift length longer than 8 hours is of diminished value. Under the summary judgment standard of review, we must assume that the guards working a 12-hour shift provided the same level of security as a guard working an 8-hour shift. Accordingly, we hold that a material factual dispute prevents the entry of summary judgment.

Another factor preventing the entry of summary judgment is GWFS' argument that use of the daily situation reports was a violation of the task orders. As noted in the facts above, the task orders provided for on-site visual inspection to determine whether the contractor satisfied the manning requirements (*see*, *e.g.*, R4, tab 13 at 910). Board precedent holds that the government may use other tests so long as they do not create a more stringent standard of performance. *See Circle Constr. Group*, ASBCA No. 38844, 90-3 BCA ¶ 22,999 at 115,493. Here, GWFS was already required by the task orders to submit daily situation reports listing the guards on duty that day. The government's use of the daily situation reports imposed no additional burden on GWFS.

The government cites *Gibbs Shipyard*, *Inc.*, ASBCA No. 9809, 67-2 BCA ¶ 6,499 at 30,241, for the proposition that the government can rely upon tests not specified in the contract so long as the defects would have been discovered through the contractual tests (gov't reply at 10). The government contends that GWFS' "lack of personnel to cover shifts would have manifested in a visual inspection of the designated posts" (*id.*). GWFS included declarations indicating that the government performed visual inspections and did not note any non-compliance with the staffing requirements (app. resp. at 15; attach. C at ¶ 4, D at ¶ 4, E at ¶ 4, F at ¶ 4). In addition, GWFS cites to government reports finding that GWFS did satisfy the contractual requirements (R4, tab 359 at 17441, tab 362 at 17449). Once again, we find that a material factual dispute prevents entry of judgment in the government's favor.

The government characterizes GWFS position as falsely treating "security [as] a binomial condition – security exists or it doesn't" and contending that "security is more properly charted across a gradient rather than existing as a binomial condition"

13

(gov't reply at 4). Government counsel additionally argues that "[p]erforming guard duty is more than having a warm body capable of fogging a mirror sitting in a tower" (*id.*). However, it is the government's final decision that treats security as a binomial condition. The COFD pays GWFS the contractual price for up to 8 hours per guard per day and then refuses payment for any time worked beyond the end of the 8-hour shift.

Moreover, the shift-duration language relied upon by the government was not contained in task order no. 0K04 and only for one guard category for task order no. 0K08. Even for the task orders that contain the daily work hour limitation, it is not applicable to all labor positions. Because the final decision simply compares the number of names on the daily reports with the number of positions in the manning tables, it is unclear whether the extra hours were provided by guards in labor categories that were subject to the daily hour limitations.

In Count 2, GWFS alleges that "[t]he Government actually or constructively changed the Contract and the Task Orders when it changed invoicing requirements to prevent GWFS from invoicing the full FFP reflected in each task order" (2nd Amend. Compl. ¶ 390). As we interpret the contract and task orders above, GWFS was required to provide security services and comply with the minimum staffing requirements; however, the government forced GWFS to invoice only on the basis of 8 hours per worker per shift, as if the contract were a time and materials or level of effort contract. Without any evidence of record that the work performed beyond 8 hours in a shift was of no value, we deny the government's motion with regard to Count 2.

The government additionally moves for summary judgment with regards to Counts 1, 5, 8, and 10 of GWFS' complaint because the counts are "derivative" of Counts 2 and 3 and therefore must fail (gov't mot. at 19). As we have denied the government's motion with regard to Count 2 we must similarly deny the motion with regard to the remaining counts. Count 1 alleges a breach of contract due to the government's failure to pay GWFS the full firm-fixed-price amounts. Count 5 alleges a breach of the duty of good faith and fair dealing. Counts 8 and 10 allege government abuses of discretion. Resolving Count 3 in favor of the government does not resolve these issues.

14

<u>CONCLUSION</u>

For the reasons stated above, we grant the government's motion with regard to Count 3 of GWFS' second amended complaint and deny the government's motion with regard to Counts 1, 2, 5, 8, and 10.

Dated: March 30, 2022

DAVID D'ALESSANDRIS
Administrative Judge
Armed Services Board
of Contract Appeals

I <u>concur</u>

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I <u>concur</u>

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 62442, 62686, 62718, 62793, 62794, Appeals of Aegis Defense Services, LLC d/b/a GardaWorld Federal Services, rendered in conformance with the Board's Charter.

Dated: March 30, 2022

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

15